## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| MEREDITHS' INC., D/B/A SAVERSYSTEMS, AS SPONSOR OF THE SAVERSYSTEMS EMPLOYEE STOCK OWNERSHIP PLAN, and SAVERSYSTEMS EMPLOYEE STOCK OWNERSHIP PLAN ADMINISTRATIVE COMMITTEE, AS PLAN ADMINISTRATOR, EACH ON BEHALF OF THE SAVERSYSTEMS EMPLOYEE STOCK OWNERSHIP PLAN, <br><br> *Plaintiffs,* <br><br> v. <br><br> MICHAEL MILLER, JOHN MEREDITH, and DAVID BARNES, <br><br> *Defendants.* | ) ) ) ) ) ) ) ) **Case No.:** 1:23-cv-01877 ) ) ) ) **FILED UNDER SEAL** ) ) ) ) ) ) |

## <u>COMPLAINT</u>

### INTRODUCTION

1.     Plaintiffs bring this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, *et seq.*, for violations of ERISA against Defendants Michael S. Miller ("Miller"), Trustee of the SaverSystems Employee Stock Ownership Trust (the "Trust"), established pursuant to the SaverSystems Employee Stock Ownership Plan (the "Plan" and together with the Trust, the "ESOP"), John Meredith ("Meredith"), and David Barnes ("Barnes"), owners of Merediths' Inc. d/b/a SaverSystems  ("SaverSystems" or "Company") shares at the time of the Transaction (Meredith and Barnes are referred to collectively as "Sellers"), for

losses suffered by the ESOP and other appropriate equitable relief under Sections 404, 405, 409, and 502(a)(2) and (3) of ERISA, 29 U.S.C. §§1104, 1105, 1109 and 1132(a)(2) and (3).

2.      Defendants caused losses to the ESOP when the Company, Sellers, and ESOP entered into a transaction (the "Transaction") whereby the Company redeemed the stock owned by Barnes, and Meredith sold his stock to the ESOP, at an inflated price pursuant to a Stock Purchase and Redemption Agreement dated November 24, 2020. The overpayment caused a direct loss to the ESOP and constituted a prohibited transaction.

3.      Miller, as Trustee to the ESOP, caused the ESOP to purchase Meredith's shares in the Company at an inflated price pursuant to the Stock Purchase and Redemption Agreement dated November 24, 2020. In doing so, Miller breached his fiduciary duty to the ESOP by failing to negotiate on behalf of the ESOP or undertake a reasonable process to ensure the adequacy and accuracy of the Company valuation that served as the basis for the Transaction. Instead, Miller unreasonably relied on a valuation that adopted inflated and flawed financial projections provided by Company management, including Meredith and Barnes.

4.      Meredith was a Company director and member of the SaverSystems Employee Stock Ownership Plan Administrative Committee (the "Plan Administrator") at the time of the Transaction. As co-fiduciary, Meredith had actual knowledge that

Miller had breached his fiduciary duty by approving a prohibited transaction for more than adequate consideration and failed to take reasonable steps under the circumstances to remedy the breach and thus is liable as a co-fiduciary for the losses caused to the ESOP by Miller.

5.      Both Meredith and Barnes participated in and benefitted from the Transaction knowing that the ESOP was purchasing Meredith's shares for more than fair market value. Meredith and Barnes provided inflated financial projections that served as the basis for the Transaction. As such, Meredith and Barnes knowingly participated in a prohibited transaction.

### JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

7.      Venue with respect to this action lies in the Southern District of Indiana, pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the ESOP was administered and the breaches alleged herein took place in Richmond, Wayne County, Indiana, within this district.

### PARTIES

8.      Plaintiff SaverSystems is an Indiana Corporation. SaverSystems is a fiduciary of the ESOP under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). As Plan Sponsor pursuant to Section 1.40 of the Plan, it exercises authority and discretion over the ESOP

through, among other things, its power to appoint and remove the Trustee and Plan Administrator under Section 13.1 of the Plan Document.

9.    Plaintiff SaverSystems Employee Stock Ownership Plan Administrative Committee is the Plan Administrator of the ESOP, duly appointed by the Company in its capacity as Plan Sponsor. The Plan Administrator is a named fiduciary under Section 1.22 of the Plan Document and is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

10.    Defendant Michael S. Miller is the Trustee of the ESOP. The Trustee is a named fiduciary under Section 1.22 of the Plan and is a fiduciary under ERISA § 3(21), 29 U.S.C. § 1002(21)(A). Miller was appointed Trustee of the SaverSystems Employee Stock Ownership Trust ("Trust") by resolution of the Company dated November 20, 2020, effective as of the date of his engagement agreement with the Trust dated August 24, 2020. Miller was removed as Trustee by resolution of the Company board on October 3, 2023, effective on 30 days written notice. Miller was the discretionary trustee for purposes of evaluating the prudence, adequate consideration, and fairness of the 2020 Transaction for the ESOP. Miller exercised discretionary authority and control over the management and disposition of the ESOP's assets by approving the Transaction.

11.    Defendant John Meredith is an individual residing in Richmond, Indiana. Meredith was a fiduciary to the ESOP under ERISA § 3(21) as a member of the Plan Administrative Committee from the date of the establishment of the Administrative

4

Committee by Company resolution on November 20, 2020 until April 17, 2023.

Meredith also exercised control over the ESOP by actively participating in the concept

for the Transaction, setting up the structure of the Transaction, and selecting Miller as

Trustee. As a fiduciary, the CEO, member of the board, and 90% shareholder of

SaverSystems at the time of the Transaction, Meredith was also a party in interest

pursuant to ERISA § 3(14)(H). Meredith currently serves on the Board of Directors of

SaverSystems.

12.     Defendant David Barnes is an individual residing in Loveland, Ohio. At

the time of the Transaction, Barnes was an employee of the Company and owned 10%

of the shares of the Company and was therefore a party in interest under ERISA

§ 3(14)(H).

**FACTS**

**A.     The Company**

13.     SaverSystems is a specialty chemical manufacturer that develops products

for the professional chimney maintenance and repair market, along with a line of

consumer brand products.

14.     SaverSystems' Board is currently composed of three independent

directors, the current CEO Phillip Stoller, and Meredith.

15.     At the time of the Transaction, the Board consisted of John Meredith; his wife, Gayla Meredith; his son, Tom Meredith; his daughter, Tricia Meredith; and his son-in-law, Jason Wright (the "Family Board").

16.     At the time of the Transaction, the sole shareholders of the Company were Meredith and Barnes. Meredith held at 90% interest in the company (300,000 shares), and Barnes held the remaining 10% (33,333 shares).

**B.     The ESOP Transaction**

17.     On November 20, 2020, the Company, by resolution signed by  Meredith and the Family Board, adopted the ESOP, effective January 1, 2020. The Plan Document is attached hereto as **Exhibit A**. On the same day, the Company, again by resolution of Meredith and the Family Board, appointed Miller as Trustee effective as of the date of his engagement with the Trust on August 24, 2020, and Meredith and Miller signed a Trust Agreement entered into on November 20, 2020, attached hereto as **Exhibit B**.

18.     Both Meredith and Barnes were involved in choosing Miller as Trustee, including interviewing Miller and other candidates for the position. During the process of choosing Miller for the trustee position, Barnes remarked that a trustee candidate was not selected because that trustee candidate was only willing to pay up to a certain EBITDA multiple.

19.     Under Section 4.2 of the Plan Document, "[a]ll purchases of Stock by the Trust Fund will be made at a price . . . which, in the judgment of the trustee, do not

6

exceed the Value of the Stock." The Plan Document defined Value to mean, in the case of securities that are not readily tradable on an established securities market, "the fair market value of the securities, determined by the Trustee in good faith and in accordance [with ERISA]." Ex. A, § 1.49.

20.     Under Section 2.3(e) of the Trust Agreement, Miller, as Trustee, had the power to "contract or otherwise enter into transactions between the Trustee and the Company or any Company shareholder . . . with respect to the purchase or sale of Company Stock."

21.     Under Section 2.5(d) o the Trust Agreement, Miller, as Trustee, was required to "discharge his duties . . . solely in the interest of Participants and other persons entitled to benefits under the Plan . . . in a manner that does not constitute a non-exempt prohibited transaction [under ERISA]."

22.     Simultaneous with the creation of the Plan and appointment of the Trustee, the Company, by resolution of Meredith and the Family Board dated November 20, 2020, established the Administrative Committee and appointed the Administrative Committee as Plan Administrator. Meredith was a member of the Administrative Committee at the time of the Transaction.

23.     Pursuant to the terms of a Credit Agreement with First Merchants Bank dated as of November 24, 2020, the Company entered into a new credit facility with First Merchants Bank. The Company entered into a $6 million senior term loan to fund a

portion of the ESOP Transaction and established a $2.5 million line of credit, a portion of which was used to fund the ESOP Transaction. Collectively, the senior term loan and the line of credit are referred to as the "Senior Loan."

24.     Pursuant to the terms of a Stock Purchase and Redemption Agreement dated November 24, 2020 (the "SPA"), the Company redeemed Barnes's 33,333 shares, and the ESOP purchased Meredith's 300,000 shares (the "Transaction") for an aggregate amount equal to $24,499,205 or approximately $73.50 per share, subject to Purchase Price Adjustments set forth in the SPA.

25.     Pursuant to the SPA, the Company, under the direction of Meredith and the Family Board, redeemed all of Barnes's 33,333 shares in exchange for a cash payment of $1,242,000 and a $1,207,921 promissory note with a term of 9 years and an interest rate of 12%, 4.5% was currently payable on a quarterly basis and the remainder deferred, for a total amount of $2,449,921 or approximately $73.50 per share ("Redemption Note"). The amount of the promissory note at the time of the Transaction incorrectly stated that the amount was $1,027,921. The amount of the promissory note was later corrected to $1,207,921.

26.     Due to a post-closing adjustment in the SPA in the purchase price for the ESOP Transaction, based on net cash, outstanding debt, and working capital, the Company paid Barnes an additional amount of $73,004 in cash. In total, after the post-closing adjustment, the Company paid Barnes $2,522,925 for his shares.

27.     The Company loaned a portion of the proceeds of the Senior Loan to the ESOP for use by the Trust to fund its purchase of Meredith's 300,000 shares ("First Inside Loan"). The First Inside Loan is repayable to the Company over a term of 40 years and is secured by a pledge of the portion of the shares purchased with the proceeds of the First Inside Loan.

28.     Pursuant to the November 24, 2020 SPA, the ESOP, under the direction of Miller as Trustee, purchased Meredith's 300,000 shares for $22,049,284. This amount was funded with $4,026,496.88 in cash using proceeds from the First Inside Loan and a $18,022,787.12 promissory note ("First Seller Loan Note").

29.     The First Seller Loan Note was secured by a pledge of the portion of the shares that was purchased with the First Seller Loan.

30.     Due to the post-closing adjustment in the SPA described above, the price paid for Meredith's shares was increased by $657,044. After the post-closing adjustment, the total paid by the ESOP to Meredith for his 300,000 shares was $22,706,328.

31.     After the post-closing adjustments, the amount paid to Barnes for his 33,333 shares was $2,522,925, and the amount paid to Meredith for his 300,000 shares was $22,706,328, for a total purchase price paid to Sellers for their shares in the Transaction of $25,229,293 (the "Purchase Price").

32.     After the ESOP purchased Meredith's shares, Meredith, the Company, and the ESOP entered into an assumption agreement whereby the Company assumed

responsibility for the payment for the First Seller Loan Note and the Company issued a "Refinanced Seller Note" in exchange for the First Seller Note. The Refinanced Seller Note included detachable warrants ("Warrants") for the purchase of up to a total of 72,500 newly issued shares (post-split), which equaled 16.4% of the equity of the Company on a fully diluted basis.

33.    The ESOP and the Company subsequently consolidated the amounts under the First Inside Loan and the First Seller Loan into a single refinanced loan and promissory note ("Refinanced Inside Loan"). The Refinanced Inside Loan is secured by a pledge of the shares purchased from Meredith.

C.    **Post-Transaction Company Control**

34.    The redemption of Barnes's shares by the Company and the purchase of Meredith's shares by the ESOP is governed by the November 24, 2020, SPA.

35.    Under Section 5.7 of the SPA, the Company was required to, no later than 12 months after closing, "take all necessary actions to cause the Board of Directors to consist of five (5) members, two of whom will be 'Independent Directors.'"

36.    On November 20, 2020, the Family Board resolved to amend the Company's bylaws (the "First Amended Bylaws").

37.    Under the First Amended Bylaws, the Board of Directors was to consist of five individuals, except that the number of directors could be less than five until

December 1, 2021. By December 1, 2021, no fewer than two of the five directors were to be Independent Directors.

38.     Under the First Amended Bylaws, Meredith was to remain as CEO until December 1, 2029 or payment in full of the Refinanced Seller Note. The First Amended Bylaws also required Meredith to be one of three members of the Nomination Committee, which was responsible for nominating a slate of candidates for election to the Board of Directors for approval by the shareholders. Only one of the three members of the Nomination Committee was required to be an Independent Director.

39.     Special Board meetings could only be called by the CEO or any three members of the board.

40.     Further, under the First Amended Bylaws, the Bylaws could not be amended without the consent of Meredith during the period which amounts are due under the Refinanced Seller Note.

41.     A Letter of Intent Summary Term Sheet signed by the Trustee and entered into prior to the adoption of the First Amended Bylaws provided that the Code of Regulations of the Company would be amended to the satisfaction of the Trustee.  As such, the Trustee had access to the First Amended Bylaws which were amended to his satisfaction prior to signing the November 24, 2020 Stock Purchase and Redemption Agreement, and understood that the ESOP would not gain total control over SaverSystems after the transaction.

D.    **Company Valuation**

1.    *Lazear Capital Partners Is Retained by the Company*

42.    Prior to the Transaction, the Company, under Meredith's direction, hired non-party Lazear Capital Partners ("Lazear") as a financial advisor. In August 2020, Lazear provided to the Company certain financial metrics and projections concerning the Company. Based on information provided by Company Management, including Meredith and Barnes, the Company's historical adjusted EBITDA was $1.344 million (2016); $1.394 million (2017); $1.247 million (2018); 1.722 million (2019); and 1.818 million (YTD through 7/31/2020). This equated to adjusted EBITDA percent of net sales of 19.9% (2016); 19.8%  (2017); 16.9% (2018); 19% (2019); and 29.6% (YTD 7/31/2020).

43.    Unadjusted, the historical EBITDA and EBITDA percent of net sales for these years was 229,000 (4.4%); 391,000 (5.6%); 306,000 (4.2%); 651,000 (7.2%); and 752,000 (12.2%), respectively. The Company's gross margin during these years was: ████ ████████████████████████████████████████████████████████████ .

44.    Management's (including Meredith and Barnes's) forecasted adjusted EBITDA was ████████████████████████████████████████████████ ████████████████████████████████████████████ The gross margin used by Management for these projections was increased to ██████ (2020), and ████ (2021 through 2025) from the ████████ historical gross margins.

45.    The adjusted EBITDA percent of net sales was also increased by Management (including Meredith and Barnes) in these projections to ███████ ████████████████████████████████████████████████████ in contrast to the 4 to 12.2% unadjusted, and 19 to 29.6% adjusted, historical EBITDA.

46.    Management's projections for the Company were unreasonable and deviated significantly from the Company's historical financial performance. Barnes and Meredith knew or should have known that the projections were unreasonable because, among other things, the projections significantly deviated from the Company's historical performance and the industry average. Further, an employee of the Company who was working on creating the Company's operating budget for 2021 expressed concern to Meredith prior to the Transaction that the Company would not be able to meet Management's projections.

47.    Additionally, an employee of the Company who helped provide information about the Company's financials (at Barnes's and Meredith's request) expressed to Barnes that it appeared that Barnes and Meredith were "fudging the numbers." Barnes instructed the employee to "never say that again."

2.    *Vision ESOP Valuation and Fairness Opinion*

48.    Miller, in his capacity as Trustee, retained non-party Vision ESOP Valuation, LLC ("Vision") as an independent financial advisor regarding the ESOP Transaction.

49.    In an opinion dated November 24, 2020, Vision provided an opinion that the purchase price for Meredith's 300,000 shares was fair based on Vision's analysis concluding that the fair market value of Meredith's common stock on a limited-marketable, controlling-interest basis as of November 24, 2020 was between ███████ and ███████ with a midpoint of ███████

50.    Vision based its valuation on information that was prepared by Company management (including Meredith and Barnes), financial statements of the Company for the years ended December 31, 2016 through 2019, and internal financial statements of the Company through October 31, 2020. In a letter dated November 24, 2020, to Vision from Meredith as CEO, Meredith certified that "[t]he forecasts for the fiscal years ending December 31, 2020, through 2024 presented to you in November 2020 were . . . reasonable and appropriate, and remain so as of the date hereof."

51.    In reaching its valuation, Vision relied in part on similar historical adjusted EBITDA provided by Lazear of $1.203 million (2016); $1.351 million (2017); $1.235 million (2018); $1.650 million (2019) and 2.780 million (YTD 10/31/2020). This equated to adjusted EBITDA percent of net sales of 17.8% (2016); 19.2% (2017); 16.8% (2018); 18.2% (2019); and 25.9% (YTD 10/31/2020).

52.    In its financial projections, Vision stated that it "modified management's sales and EBITDA projections in the years following 2021, while keeping all other figures equal due to the aggressive nature of the projections." Yet despite this

representation, Vision relied on financial projections that were substantially similar to the flawed and inflated projections of Company's management.

53.    Vision projected adjusted EBITDA of ████████████████████ ████████████████████████████████████████ Projected adjusted EBITDA as a percent of net sales for 2020 was ████████ for each of the years 2021 through 2024 — an increase from the historical 4 to 12.2% unadjusted EBITDA as a percent of net sales, and 19 to 29.6% adjusted EBITDA as a percent of net sales. Projected gross margins for these years was ██████ for 2022 and ██████ for each of the years 2021 through 2024, an increase from the ████████ historical gross margins.

54.    Vision also valued the Company based on the assumption that the ESOP would obtain a 100% controlling interest in the Company. But as discussed above, Meredith retained control over the amendment of the Company's Bylaws, would be CEO until 2029 or the Refinanced Seller Note was paid, and was a required member of the board and Nomination Committee of the board (of which only one member was required to be an Independent Director). As such, the ESOP, though it would own 100% of the Company's shares, would not have full control over the Company. Vision's failure to account for the lack of control in its valuation was unreasonable. The Trustee's reliance on Vision' valuation, given Vision's failure to account for lack of control, in the Trustee's negotiation of the Purchase Price was not reasonably justified under the circumstances and a breach of his fiduciary duty.

E.    **Miller, Meredith, and Barnes Violate Their Duties under ERISA**

55.    Under the Plan Document, the Trust Agreement, and ERISA, Miller as Trustee, had a fiduciary responsibility to ensure that the purchase price paid by the ESOP for Meredith's shares was for fair market value.

56.    Moreover, under the terms of the SPA the redemption price paid for Barnes's shares by the Company was to be the same as that paid by the ESOP for Meredith Shares. Thus, any overpayment for Barnes's shares would increase the price paid by the ESOP for Meredith's shares and increase Company debt (which would be taken on by the ESOP). Miller therefore had a fiduciary responsibility to ensure that the total Purchase Price in the Transaction for both Meredith and Barnes shares was for fair market value. Because of his fiduciary duty, Miller was obligated to review Vision's valuation report in order to understand its analysis and conclusions, and to identify, question, and test its underlying assumptions.

57.    Miller  however, accepted Vision's valuation, even though the valuation heavily relied on flawed financial projections provided by Company's management, including Meredith and Barnes who were interested in obtaining the highest possible value for their shares. Because Vision's valuation was heavily based on flawed financial projections provided by Company's management, including Meredith and Barnes, Miller's reliance on Vision's valuation was unreasonable under the totality of the circumstances.

58.    Miller knew or should have known that reliance on Vision's opinion was not justifiable. Indeed, the drastic increase in projected adjusted EBITDA, adjusted EBITDA as a percent of net sales, and gross margin from the Company's historical financial performance, in addition to the control Meredith and his family would retain over the Company, should have put Miller on notice that Vision's valuation was flawed.

59.    As such, Miller failed to comply with his fiduciary duties and caused the ESOP to pay more than fair market value for Meredith's shares and caused the ESOP to engage in a prohibited transaction, causing losses to the ESOP that have not been remedied. Miller knew or should have known that the fair market value of Meredith's shares was less than the purchase price paid for them by the ESOP.

60.    As a result of the prohibited transaction, the Company became indebted to Barnes and Meredith. These debts reduced the value of SaverSystems and consequently reduced the fair market value of the shares that the ESOP had purchased.

61.    ESOP participants who had received stock from the Transaction saw the fair market value of those shares drop as a result of the debt that the Company incurred to finance the Transaction.

62.    Meredith was a member of the Plan Administrative Committee and therefore had fiduciary duties to the ESOP. Meredith also exercised pervasive control and authority over the ESOP by helping develop the Transaction, providing the

financial projections that served as the basis of the Transaction, and selecting Miller as Trustee.

63.    Meredith knew that he provided inflated projections to Lazear and Vision in order to unjustifiably increase the Purchase Price. Yet Meredith failed to disclose that he provided inflated projections and knew that the ESOP was overpaying for his shares. Meredith therefore knew that Miller was breaching his fiduciary duty by causing the ESOP to engage in a prohibited transaction but failed to take reasonable efforts under the circumstances to remedy those breaches of fiduciary duty. Instead, Meredith participated in and benefitted from Miller's breaches, causing losses to the ESOP that have not been remedied.

64.    Barnes helped to structure the Transaction and select Miller as Trustee. Yet Barnes failed to disclose that he provided inflated projections and knew that the ESOP was overpaying for Meredith's shares. Barnes also knew or should have known that the ESOP purchased Meredith's shares for more than fair market value, rendering the Transaction a prohibited transaction under ERISA. Barnes, however, elected to nonetheless participate in and benefit from the Transaction, causing losses to the ESOP that have not been remedied.

<u>COUNT I</u>

**By causing the ESOP to purchase Company stock for more than adequate consideration, Miller caused a prohibited sale of property between the ESOP and a party in interest in violation of § 406(a)(1)(A) and (D).**

65.    Paragraphs 1 through 64 are incorporated by reference.

66.    Defendant Miller caused the ESOP, of which he was a fiduciary, to acquire stock in the ESOP's corporate sponsor by purchasing the shares from a party in interest in the Transaction, within the meaning of ERISA Section 3(14), 29 U.S.C. § 1002(14).

67.    The ESOP's acquisition of stock from a party in interest violated ERISA Sections 406(a)(1)(A) and (D), 29 U.S.C. §§ 1106(a)(1)(A) and (D), which prohibits a fiduciary from causing the ESOP to engage in a transaction if he knows or should know that such transaction constitutes a direct or indirect sale or exchange, or leasing, of any property between the plan and a party in interest; or transfer to, or use by or for the benefit of, a party in interest, of any assets of the ESOP.

68.    The Sellers were parties in interest to the ESOP because they were employees, officers, directors, and/or 10 percent or more shareholders of SaverSystems. ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

69.    Thus, by approving this party in interest Transaction on behalf of the ESOP, Miller caused the ESOP, of which he was a fiduciary, to engage in a prohibited transaction.

70.    ERISA § 408(e), 29 U.S.C. § 1108(e), provides an exemption to the prohibited transaction requirements by allowing plans to purchase stock from parties in

interest as long as the price paid does not exceed adequate consideration. Adequate consideration is defined in ERISA § 3(18), 29 U.S.C. § 1002(18) as the "fair market value of the asset as determined in good faith by the trustee or name fiduciary pursuant to the terms of the plan and in accordance with the regulations promulgated by the Secretary [of Labor]."

71.     By causing the ESOP to acquire stock in the Transaction at a price that exceeded "adequate consideration," and failing to follow a prudent and good faith investigation process in determining the value of the stock, Miller failed to meet the conditions of any exemptions in ERISA § 408, 29 U.S.C. § 1108, including ERISA § 408(e), 29 U.S.C. § 1108(e).

72.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a fiduciary to bring a suit for relief under ERISA § 409, 29 U.S.C. § 1109.

73.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) permits a fiduciary to bring suit (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

74.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach,

and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

75.     As a result of the fiduciary breach described above, Miller caused the ESOP, of which he was a fiduciary, to suffer financial losses for which he is personally liable pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a) and §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3).

## COUNT II

**By causing the ESOP to purchase Company stock for more than adequate consideration, Miller violated his fiduciary duties of prudence and loyalty to the ESOP in connection with the 2020 transaction in violation of ERISA Sections 404(A)(1) and (B)**

76.     Paragraphs 1-75 are incorporated by reference.

77.      Defendant Miller caused the ESOP, of which he was a fiduciary, to acquire stock in the ESOP's corporate sponsor by purchasing the shares from a party in interest in the Transaction, within the meaning of ERISA Section 3(14), 29 U.S.C. § 1002(14).

78.     The ESOP's acquisition of stock from a party in interest violated ERISA Sections 406(a)(1)(A) and (D), 29 U.S.C. §§ 1106(a)(1)(A) and (D), which prohibits a fiduciary from causing the ESOP to engage in a transaction if he knows or should know that such transaction constitutes a direct or indirect sale or exchange, or leasing, of any property between the plan and a party in interest; or transfer to, or use by or for the benefit of, a party in interest, of any assets of the ESOP.

79.    The Sellers were parties in interest to the ESOP because they were employees, officers, directors, and/or 10 percent or more shareholders of SaverSystems. ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

80.    Miller is a fiduciary to the ESOP. As such, Miller had a responsibility to the ESOP and its participants to discharge his duties with respect to the Plan solely in the interests of ESOP participants and beneficiaries with care, skill, prudence, and diligence. Miller had a fiduciary duty to not cause the ESOP to engage in a prohibited transaction in violation of ERISA.

81.    In connection with the Transaction described above, Miller breached his fiduciary duty to the ESOP, of which he was a fiduciary, to act solely in the interests of participants and beneficiaries with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(A) and (B) by, among other things, accepting and failing to notice and address the obvious deficiencies in Vision's valuation justifying the unadjusted purchase price of $22,049,284 for Meredith's and $2,449,921 for Barnes' shares, even though the valuation heavily relied on obviously flawed financial projections provided by Company's management — including Meredith and Barnes who were interested in obtaining the highest possible value for their shares — and assumed, wrongly, that the ESOP would have a 100% controlling interest in the

Company. Miller's conduct in the Transaction, including but not limited to his reliance on Vision's valuation, was unreasonable under the totality of the circumstances and a breach of his fiduciary duty.

82.     As a result of his breach, Miller, in violation of ERISA, the Plan Document, and the Trust Agreement, caused the ESOP to overpay for Meredith's shares and engage in a prohibited transaction.

83.     As set forth above, Miller breached his fiduciary duties in violation of ERISA § 404. As a result, he caused losses to the ESOP for which he is personally liable pursuant to ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), and § 409(a), 29 U.S.C. § 1109(a).

<u>C<span style="font-variant:small-caps">OUNT</span> III</u>

**John Meredith and David Barnes are liable as knowing participants in a prohibited transaction under ERISA Section 502(a)(3), and John Meredith is  liable under ERISA Sections 405(a)(1) and (3) as a co-fiduciary for the fiduciary breaches of Miller**

84.     Paragraphs 1-83 are incorporated by reference.

85.     The ESOP's acquisition of stock from a party in interest violated ERISA Sections 406(a)(1)(A) and (D), 29 U.S.C. §§ 1106(a)(1)(A) and (D), which prohibits a fiduciary from causing the ESOP to engage in a transaction if he knows or should know that such transaction constitutes a direct or indirect sale or exchange, or leasing, of any property between the plan and a party in interest; or transfer to, or use by or for the benefit of, a party in interest, of any assets of the ESOP.

86.    Meredith and Barnes were parties in interest to the ESOP because they were employees, officers, directors, and/or 10 percent or more shareholders of SaverSystems. ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

87.    As set forth above, Meredith and Barnes, parties in interest within the meaning of ERISA, knew or should have known that they participated in the nonexempt prohibited Transaction described herein. As set forth above, Meredith and Barnes  knew or should have known that the price they  received in the November 24, 2020, Transaction exceeded fair market value. They, therefore, may be made subject to such other appropriate equitable relief to redress the violations in which they participated, including disgorgement of their profits arising from their participation in the Transaction. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

88.    At the time of the Transaction, Meredith was member of the Plan Administrative Committee and a director of the Company and therefore a fiduciary to the ESOP. Meredith was also a fiduciary because he exercised pervasive control and authority over the ESOP through his participation in structuring the Transaction and selecting Miller as Trustee. As a fiduciary, Meredith was required to discharge his duties with respect to the ESOP solely in the interest of the ESOP's participants and beneficiaries.

89.    As set forth above, Meredith knew of his co-fiduciary's breaches of fiduciary duty but failed to make reasonable efforts under the circumstances to remedy

those breaches of duty. Meredith had actual knowledge that the price he received in the

November 24, 2020, Transaction exceeded fair market value. Meredith also had actual

knowledge that Miller had breached his fiduciary duty by approving a prohibited

transaction for more than adequate consideration. Accordingly, Meredith is liable as a

co-fiduciary for the losses caused to the ESOP by the other fiduciary. ERISA §§ 405(a)(1)

and (3), 29 U.S.C. §§ 1105(a)(1) and (3), and §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2)

and (3).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants for the following

relief:

(a)      Declare that Miller caused the ESOP to engage in a prohibited transaction

causing losses to the ESOP;

(b)      Declare that Meredith and Barnes participated in and benefited from a

prohibited transaction causing losses to the ESOP;

(c)      Declare that Miller breached his fiduciary duties to the ESOP and in doing

so caused losses to the ESOP;

(d)      Declare that Meredith knew of Miller's breaches of his fiduciary duties to

the ESOP and is therefore as a co-fiduciary jointly and severally liable with Miller

for the losses caused to the ESOP;

(e)      Enjoin Defendants from further violations of ERISA and their fiduciary

duties;

(f)      Order that Meredith and Barnes, jointly and severally, make the ESOP

whole for the loss to the ESOP from their violation of ERISA from participating

in and benefiting from the prohibited transaction and disgorge any cash,

payments, or proceeds that they received from the prohibited transaction;

(g)      Order that Miller and Meredith, jointly and severally, make good to the

ESOP the losses resulting from their breaches of fiduciary duty;

(h)      Award Plaintiffs' reasonable attorneys' fees and costs of suit incurred

herein pursuant to ERISA § 502(g), 29 U.S.C. § 1131(g);

(i)      Order Defendants to pay prejudgment interest; and

(j)      Award such other and further relief as the Court deems equitable and just.

Dated: October 18, 2023                Respectfully submitted,

                                       /s/Manuel Herceg
                                       Manuel "Manny" Herceg, Atty. No. 29956-06
                                       Taft Stettinius & Hollister LLP
                                       One Indiana Square, Ste. 3500
                                       Indianapolis, IN 46204
                                       (317) 713-3500
                                       mherceg@taftlaw.com

                                       Patrick S. Williams (#0196502)(Pro Hac Vice
                                       Forthcoming)
                                       A. Christopher Brown (#0403283)(Pro Hac Vice
                                       Forthcoming)
                                       2200 IDS Center
                                       80 South Eighth Street
                                       Minneapolis, MN 55402
                                       Telephone::   (612) 977-8400
                                       Facsimile::   (612) 977-8650
                                       Emails:       pwilliams@taftlaw.com
                                                     cbrown@taftlaw.com

                                       **ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 18, 2023, I electronically filed the foregoing document with the Clerk of the Court and served all parties of record using the electronic court filing system.

*/s/ Manuel Herceg*
Manuel Herceg
